```
          IN THE UNITED STATES DISTRICT COURT FOR
         THE DISTRICT OF MARYLAND, NORTHERN DIVISION


NATIONAL CREDIT REPORTING    *
ASSOCIATION, INC., et al.,
                             *
     Plaintiffs,
                             *
         v.                         CIVIL NO.: WDQ-08-2322
                             *
EQUIFAX, INC., et al.,
                             *
     Defendants.
                             *
*    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION

National Credit Reporting Association, Inc. ("NCRA") and Lenders' Credit Services, Inc. ("Lenders' Credit") sued Equifax, Inc. ("Equifax"), Equifax Information Services LLC, and Equifax Real Estate Mortgage Solutions LLC ("EMS") for violations of Section 7 of the Clayton Act[1] and Section 2 of the Sherman Act.[2] For the following reasons, and for the reasons stated at the hearing on September 12, 2008, the Plaintiffs' motion for a temporary restraining order was denied.

I.   Background

A.   The Parties and Mortgage Credit Reporting

The NCRA is a trade association that represents credit reporting agencies ("CRAs"). Equifax is a consumer credit data repository. Credit reports are used to underwrite residential

---

[1] 15 U.S.C. § 18 (2000).

[2] 15 U.S.C. § 2 (2000).

1

mortgage loans, which must conform to the standards of the government-sponsored entities ("GSEs"), Freddie Mac and Fannie Mae.  Loan originators, lenders and investors require "tri-merged credit reports" which contain credit information from each of the three national credit repositories: Equifax, Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion").  Mortgage CRAs create and deliver tri-merged reports to mortgage originators, brokers, lenders, and investors.  Equifax is the only repository that owns a mortgage CRA: its subsidiary, EMS.

Since the 1990s, CRAs must provide tri-merged reports electronically.  Most residential mortgage transactions are processed through two systems operated by the GSEs: Loan Prospector ("LP") and Desktop Originator/Desktop Underwriter ("DO/DU").  Around 65 percent of residential mortgages in the United States are funded by the GSEs, and many other mortgages rely on LP or DO/DU.  Freddie Mac has seven portals or connections for CRAs to access its LP system: CBC/Innovis, Credco/Credstar/CBA, Land America, LandSafe, Kroll Factual Data, EMS, and FIS-TransChicago.  Only three of the seven connections offer access to unaffiliated CRAs, one of which is FIS-TransChicago.[3]  EMS shares its connection with three subsidiary CRAs.  Kroll Factual Data serves itself and five licensees.  The remaining four connections are individually held and do not offer

---

[3] There are 85 CRAs that connect to Freddie Mac/LP through the TransChicago pipeline; 66 are NCRA members.

2

connectivity to other CRAs.

B.   Equifax's Acquisition of FIS-TransChicago and "Migration"

On February 29, 2008, Equifax and/or its subsidiaries acquired assets of FIS Credit Services, Inc., a subsidiary of Fidelity National Information Services, Inc. and thus acquired the FIS-TransChicago portal.  Equifax now controls two of the seven portals to Freddie Mac/LP: the EMS line and the TransChicago line.  During the acquisition, Equifax informed the CRAs that connect through the TransChicago line that it intended to transfer them to the EMS portal.

On August 11, 2008, an Equifax representative wrote a letter to the CRAs that connect through TransChicago announcing that this transfer or "migration" would occur September 13-14, 2008. The letter stated that once on the EMS platform, any secondary use requester[4] must be credentialed[5] with the CRA that created the original mortgage report, but if the lender is credentialed with Equifax or EMS, Equifax will waive the credentialing requirements beyond the requirement to complete an end-user agreement[6] for service.  The letter directed all CRAs to have

---

[4] A secondary use requester is an entity, such as a lender, that receives a tri-merged report from a CRA for credit information in lending.

[5] Credentialing is a process through which Equifax conducts onsite inspections of financial institutions to ensure that they meet industry standards.

[6] An end-user agreement is a contract that a CRA has with a financial institution that uses the CRA's tri-merged report, that

3

end-user agreements with lenders that make secondary use requests for a CRA's consumer reports.  Any secondary use transaction not meeting Equifax's requirements would result in an error message to the GSE.  Equifax's letter stated certain new "post-migration requirements": 1) the CRA would pay a fee for each reissue[7] it delivers, 2) the CRA would establish credentials on every lender receiving a reissued report, and 3) the CRA would obtain an end-user agreement from any lender receiving a reissued report.

On September 11, 2008, the Plaintiffs brought this action for a temporary restraining order.

## II. Analysis

### A. Injunctive Relief Under the Clayton Act

Under Section 16 of the Clayton Act, a party may sue for injunctive relief for a threatened loss from a violation of the antitrust laws when the party shows a "danger of irreparable loss."  15 U.S.C. § 26.  Injunctive relief is available "even though the plaintiff has not yet suffered actual injury," as long as the plaintiff shows "a significant threat of injury from an impending violation of the antitrust laws."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).

To receive injunctive relief under Section 16, the

---

states the terms and conditions of the parties' relationship and report usage.

[7] Reissuing is when a CRA sends the same credit report to more than one customer.

Plaintiffs must show a threat of antitrust injury. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 122 (1986). Antitrust injury is "the type the antitrust laws were intended to prevent and that flows from that which makes [the violator's] acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The demonstrated antitrust injury must be immediate. *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 529 (4th Cir. 2003).

B. Equitable Relief[8]

Preliminary injunctions and other equitable relief should be granted only in limited circumstances, when there is a need to protect the status quo and prevent irreparable harm. *Id.* at 524. The Court has discretion to issue a preliminary injunction and it should consider: (1) the likelihood of irreparable harm to the Plaintiffs if the injunction is denied; (2) the likelihood of harm to the Defendants if the injunction is granted; (3) the likelihood that the Plaintiffs will succeed on the merits; and (4) the public interest. *Id.* at 526. Harm to the Plaintiffs and to the Defendants are the two most important factors, and the

---

[8] Because the general analysis for equitable relief is similar to that for antitrust violations and reaches the same result, the Court will analyze the case under the framework stated in *Blackwelder Furniture Co. of Statesville, Inc. v. Selig Mfg. Co., Inc.*, 550 F.2d 189 (4th Cir. 1977).

likelihood of success becomes less important when the balance of harms strongly favors the movant. *Id.* The Plaintiffs must show that each factor favors injunctive relief. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). "Only if the balance tilts decidedly in favor of the plaintiffs is a right to preliminary injunctive relief warranted." *Id.* at 816 (internal quotations omitted).

1. Imminent and Irreparable Harm to the Plaintiffs

The Plaintiffs first must show irreparable harm, which must be actual and imminent and cannot be remote or speculative. *Id.* The Plaintiffs argue that they will be harmed because an interruption in connectivity will cause them to lose business because their customers will use other providers. The Defendants counter that the new platform will benefit the Plaintiffs, and there is no imminent harm because they have released or suspended all post-migration requirements.

The Plaintiffs speculated that migration would cause its customers to lose connectivity to Freddie Mac and turn to EMS for service. The Plaintiffs' customers should not lose connectivity because Equifax has agreed to suspend its end-user agreement requirement[9] for 90 days. T.R.O. Hrg. Tr. 24, Sept. 12, 2008. The Defendants also have support staff working on the migration to ensure that there are no connectivity issues. *Id.* at 24-25.

---

[9] This requirement was the Plaintiffs' most serious injury. Compl. ¶¶ 34-35.

Additionally, the harm is not imminent because Equifax has agreed to suspend its end-user agreement requirement. Further, the Plaintiffs knew in late February that the migration was going to occur but waited more than six months to file for injunctive relief. "[A] long delay in seeking relief indicates that speedy action is not required" and works against a plaintiff's showing of imminent harm. *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989).

2. Harm to the Defendants

The Plaintiffs contend that Equifax will not suffer harm because it will continue to conduct business with the CRAs that use the TransChicago portal. Equifax argues that it will suffer harm because it, and third parties, have expended substantial time and effort preparing for the migration.

The Defendants have been preparing for the migration for months, and delay would cause them harm. The employees who work on the TransChicago portal and the vendors that maintain the portal believed the migration was going to take place in mid-September. T.R.O. Hrg. Tr. 26. They were informed that their services would no longer be needed as of mid-September and have made other plans. Benay Weiss Decl., Sept. 11, 2008, ¶ 9. The TransChicago portal is older than the EMS portal, and the Defendants would need to retain the TransChicago employees to continue that portal's operation. T.R.O. Hrg. Tr. 26. The

7

Defendants were uncertain that the required employees would be available, and the system was at risk of malfunction without them. *Id.* at 26-27.

Further, many banks and other institutions that rely on the Freddie Mac portals would have suffered harm if the migration did not occur because they have already converted their systems to the EMS portal. Benay Weiss Decl., Sept. 16, 2008, ¶¶ 4, 6. Those institutions would not have been able to access the CRAs that used the TransChicago connection. *Id.* The technical developers that provided the interface between the CRAs and the TransChicago portal had already converted to EMS, and had extensively tested the new system. *Id.* ¶ 7. Thus, the balance of harms favored the Defendants.

3. The Plaintiffs' Likelihood of Success

If the balance of harms does not favor the Plaintiffs, they must make a "strong showing of likelihood of success" on the merits. *Direx Israel, Ltd.*, 952 F.2d at 818. The Plaintiffs argued that they would prevail on their Section 7, Clayton Act claim because the acquisition "is almost certain" to substantially lessen competition, and the acquisition cannot be justified by efficiency considerations. The Plaintiffs also argued that they would prevail on their Section 2, Sherman Act claim because Equifax has refused to deal with rivals without a valid business purpose. The Defendants responded that the

8

Plaintiffs' claims will fail because they have not pled antitrust injury.

To establish a Section 7 violation, the Plaintiffs must "prove a likelihood that competition may be foreclosed in a substantial share" of the market.  *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 594 (1957).  The Plaintiffs have provided no evidence of the effect migration will have on the relevant market.[10]  The Defendants have asserted that through its acquisition of the TransChicago portal, its market share increased from 7 percent to 8 percent.  Weiss Decl., Sept. 11, 2008, ¶ 14.  The Defendants estimate that the unaffiliated CRAs that connect through the TransChicago portal comprise 12 percent of the market.  *Id.*  Thus, if the Defendants acquire all of the business from the TransChicago line, they will serve approximately 20 percent of the market.  This--they contend--is an insufficient market share to constitute an antitrust violation.  *See M&M Med. Supplies and Serv., Inc. v. Pleasant Valley Hospital, Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (under Section 2 of the Sherman Act, "claims of less than 30 [percent] market shares should presumptively be rejected").  The Plaintiffs have not shown a high likelihood of success.

4. Public Interest

---

[10] The Plaintiffs assert only that up to 85 unaffiliated CRAs that connect through the TransChicago portal may use EMS after the migration.  Compl. ¶ 45.

The Plaintiffs argued that the public interest favored an injunction because the unaffiliated CRAs would lose business, and consumers would suffer because those CRAs charge lower prices. The Defendants responded that the public interest did not favor an injunction because Equifax's requirements merely enforce the Fair Credit Reporting Act's purpose of preventing inappropriate disclosure of credit information.

This is private litigation in which there no pressing public interest is threatened.  The Plaintiffs merely speculated that the migration would cause its customers to switch to EMS for connectivity, and that this would result in higher prices for the public.  As noted above, the evidence is that the Defendants' conduct would affect only 20 percent of the market for tri-merged credit reports.  The speculative harm that could affect a relatively small portion of a market niche did not implicate a great public interest.

III. Conclusion

For the reasons discussed above, the Plaintiffs' motion for a temporary restraining order was denied on September 12, 2008.


<u>September 30, 2008</u>                             <u>      /s/                </u>
Date                                         William D. Quarles, Jr.
                                             United States District Judge